UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JAMES G. MORGAN and
JEREMY P. SAPERSTEIN,

                Plaintiffs,

      -against-

COUNTY OF NASSAU, MICHAEL J. LEONE,
"FRANK" FUSAR, "MICHAEL" McGAR, and
"JOHN DOE # 1–12 (being and intended to be all
the police officers involved in the arrest of plaintiffs),
FRANK A. RUVOLO, "JOE" JACOBSON, and
"RICHARD ROE # 1–12" (being and intended to be
all the police officers involved in the interrogation
and processing of the arrest), and KATHLEEN M. RICE,

                Defendants.
-----------------------------------------------------------------X

<u>For Online Publication Only</u>

**<u>MEMORANDUM &
ORDER</u>**
13-CV-06524 (JMA) (GRB)

**FILED
CLERK**

10:47 am, Feb 17, 2017

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

      Plaintiffs have brought this action alleging false arrest, malicious prosecution, and other federal claims. Before the Court are defendants' motion for summary judgment on all claims and plaintiffs' cross-motion for summary judgment on their false arrest claim. Also before the Court are plaintiffs' motions seeking: (1) to reopen discovery; (2) to compel defendants to produce certain discovery; (3) an adverse inference based on defendants' alleged failure to produce that discovery; (4) to strike defendants' thirteen affirmative defenses; and (5) to amend the caption to add new defendants and correct spelling errors.

      For the following reasons, the Court denies plaintiffs' discovery motions, grants defendants' motion for summary judgment, denies plaintiffs' cross-motion for summary judgment, and denies plaintiffs' remaining motions.

1

# I. BACKGROUND

On May 22, 2012, plaintiffs James Morgan and Jeremy Saperstein were arrested and charged with robbery in the second degree and criminal possession of a weapon in the fourth degree, in connection with the attempted armed robbery of Delroy Harris. (Pls.' 56.1 Statement ¶¶ 1, 9, ECF No. 37–2; Defs.' 56.1 Statement ¶¶ 4, 27, ECF No. 41.)[1]

## A. __Attempted Armed Robbery and Complainant's 911 Call__

At 1:24 a.m. on May 22, 2012, the Nassau Emergency Operator received a 911 call from a man who was later identified as Delroy Harris. (911 Tr., Aff. of Harry Kutner ("Kutner Aff."), Ex. 1, ECF No. 37.) Harris told the Operator that "three kids [had] just pulled out a shotgun" on him while he was sitting in his parked car on Locust and Front Street in Uniondale, New York. (Id. at 1:3–4, 3:17–19.) Harris reported that he had parked his car to drop off his friend. Once his friend exited, the "kids" came up to his car, hit his window with a gun, and demanded that he "Give it up!" (Id. at 1:10–11, 1:17–19, 2:1–2, 3:17–19.) He then started his car and drove away. (Id. at 1:20–2:2.) Harris reported that, while driving away, he saw his assailants take off on foot, "probably" towards Front Street. (Id. at 1:13, 2:5–7.) Harris then called 911 while en route to Compass Street and Leslie Lane—also in Uniondale. (Id. at 3:5–4:14, 5:4.)

During the call, Harris described all three assailants as "black." (Id. at 2:12.) He reported that all three were wearing black hoodies, while one was wearing khaki pants. (Id. at 2:12–20.) He estimated their ages to be between seventeen and twenty years old. (Id. at 3:1–2.) Although he initially described the weapon as a "shotgun," when prompted later, he confirmed only that the

---

[1] Defendants submitted a statement of material facts pursuant to Rule 56.1 in support of their motion for summary judgment. (Defs.' 56.1 Statement.) In response, plaintiffs submitted a counter statement of facts. (Pls.' 56.1 Statement.) The Court cites to these statements only to the extent they state facts which are not in dispute. The Court notes that neither party has objected to the admissibility of any of the evidence cited in the opposing party's 56.1 Statement.

three assailants had a "gun."  (Id. at 1:3, 2:8–9.)

## B.  Police Dispatcher's Radio Communications

At 1:25 a.m., the Operator reported the attempted robbery over the police communications system.  (Nassau Cty. Police Dep't Event Search, Decl. of Pablo Fernandez ("Fernandez Decl."), Ex. C, ECF No. 42.)  The Operator reported "3 YOUTHS PULLED A GUN ON [Harris] TOLD HIM TO GIVE IT UP."  (Id. at 1.) The Operator described the assailants as "3 MALES/BLACK, ALL HAD BLACK HOODIES ONE WEARING KHAKI PANTS APPROX 17-20 YOA."  (Id. at 2.)  The Operator also reported that the assailants were "LAST SEEN HEADED TOWARD FRONT STREET."  (Id.)  It does not appear from the record that the Operator ever communicated that the assailants had a shotgun or had fled the scene of the attempted robbery on foot.  (Id. at 1– 3.)  The Operator then helped a police unit locate Harris to get his statement and coordinate a show-up identification.   (Id. at 2.)

## C.  Officer Edward Jacobsen's In-Person Interview With Complainant

According to the Crime Report, defendant Officer Edward Jacobsen located Harris in front of 408 Leslie Lane in Uniondale at approximately 1:25 a.m.  (Nassau Cty. Police Dep't Crime Report ("Crime Report"), Fernandez Decl., Ex. G at 3, ECF No. 42.)  Harris reported the following facts to Jacobsen:

- While parked in his vehicle, Harris had been approached by two black males.

- One of the assailants had a firearm and was wearing a "hoodie" and khaki pants.  That assailant had pointed the firearm at Harris and stated "Give it up!"

- The second assailant was wearing a "hoodie" and grey sweatpants.  That assailant had approached the driver-side door and shouted "Get out of the car! Get out of the car!"

- Harris then put his car in drive and drove away.

(Id.)

## D. **The Initial Detention**

At 1:31 a.m., while one police unit was locating Harris, another unit observed the plaintiffs sitting in a car, idling in front of 1066 Front Street in Uniondale. (Id.) The car was parked with its lights on, windows open, and engine running. (Id.) As they approached, Officer Gregory Holgerson and defendant Officer Michael Leone observed three passengers—one driver (later identified as Saperstein), one front seat passenger (not a party in this action), and one rear seat passenger (later identified as Morgan). (Id.) The officers further observed that the driver was white and the two passengers were black. (Id.) As they got closer to the vehicle, the police saw that the rear seat passenger (Morgan) was wearing a black ski mask covered by a blue hooded sweatshirt. (Id.) That passenger was also wearing grey sweatpants. (Nassau Cty. Police Dep't Arrest Report of James Morgan ("Morgan Arrest Report"), Kutner Aff., Ex. 8 at NC 000194, ECF No. 37.). They also saw that the driver (Saperstein) was wearing a black and white hooded sweatshirt and black sweatpants,[2] while the front seat passenger (who is not a plaintiff in this action) was wearing a gray hooded sweatshirt and khaki colored pants.[3] (Crime Report at 4; Nassau Cty. Police Dep't Arrest Report of Jeremy Saperstein ("Saperstein Arrest Report"), Kutner Aff., Ex. 8 at NC 000011, ECF No. 37.) The three passengers were eating food from McDonald's when the police approached the car. (Grand Jury Testimony of James Morgan ("Morgan Tr."), Fernandez Decl., Ex. D at 14:14–16, ECF No. 42.)

---

[2] Although the Crime Report describes Saperstein's hooded sweatshirt as "black," other police records indicate that Saperstein's hooded sweatshirt was black and white-striped. In any event, defendants do not dispute that Saperstein's actual sweatshirt differed from the sweatshirt described by Harris in his initial 911 call. (Saperstein Arrest Report at NC 000011.) Viewing the evidence in the light most favorable to plaintiff, the Court will assume that Saperstein's sweatshirt was black and white-striped.

[3] In one of plaintiffs' briefs, plaintiffs assert that none of the arrestees were wearing khaki pants. (Pls.' Superceding Mem. at 13, ECF No. 60.) This assertion, however, is not supported by any evidence in the record. Furthermore, in a different submission, plaintiffs appear to concede their co-arrestee was wearing khakis. (Pls.' Att'y Aff. in Opp'n to Mot. and in Supp. of Cross-Mot. ("Att'y Aff.") ¶ 6, ECF No. 37.)

All three men were removed from the car and patted down. (Crime Report at 4.) According to the Crime Report, the police then conducted a search of the vehicle, which revealed a black firearm contained in the vehicle's unlocked glove compartment. The police later determined that this firearm was a BB gun. (Id.) According to the Crime Report, the police then handcuffed all three men and brought Harris to the scene for a show-up identification, which is discussed below. (Id.) During this time, multiple police officers had their weapons drawn. (Pls.' 56.1 Statement ¶ 4.)

**E.  The Show-Up Identification and Arrest**

At 1:35 a.m., the police escorted Harris to the site where plaintiffs were being detained. (Crime Report at 4.) First, Harris identified the front seat passenger (not a party here) as the assailant who had approached him with a gun and stated "Give it Up!" (Id.) Then Harris identified the driver (Saperstein) as being a "subject in the robbery committed against him" and "one of the three men that walked past [his] car." (Id.; Supporting Dep. of Delroy Harris ("Harris Dep."), Kutner Aff., Ex. 8 at NC 000045, ECF No. 37.) Lastly, Harris identified the rear seat passenger (Morgan) as the assailant who had approached the driver-side door and shouted "Get out of the car! Get out of the car!" (Crime Report at 4.) Harris later confirmed his identifications via a signed supporting deposition. (Harris Dep.)

All three suspects were then placed under arrest and transported to the Nassau County Police Department's First Precinct for processing.[4] (Crime Report at 4; Saperstein Arrest Report at NC 00011, ECF No. 37; Morgan Arrest Report at NC 000194.) At the Precinct, plaintiffs were

---

[4] Plaintiffs' affidavits state, in conclusory fashion, that they were "arrested" before the search of the vehicle and the show-up identification occurred. (Pls.' 56.1 Statement ¶ 4; Aff. of James Morgan dated July 9, 2012 ("Morgan Aff. 7/9/12") ¶ 4, Kutner Aff., Ex. 8 at NC 000109, ECF No. 37; Aff. of Harry Kutner dated July 9, 2012 ¶ 56, Kutner Aff., Ex. 8 at NC 000132, ECF No. 37.) The question of when plaintiffs were placed under arrest is a legal one. As discussed below, see infra II.C.2, the Court concludes, as a matter of law, that plaintiffs were arrested prior to the search and identification.

questioned by the police. (Morgan Tr. at 14:19–22; Grand Jury Testimony of Jeremy Saperstein ("Saperstein Tr."), Fernandez Decl., Ex. E at 12:22–13:6, ECF No. 42.) Although plaintiffs participated in the interview, (Saperstein Tr. at 12:22–13:20), the police did not obtain any admissions from them, (Crime Report at 3). At some point during the questioning, the officers yelled at the plaintiffs and referred to Saperstein as a "retard." (See Morgan Tr. at 19:17–19; Aff. of James Morgan dated February 29, 2016 ("Morgan Aff. 2/29/16") ¶ 6, ECF No. 37.) Plaintiffs contend that Saperstein has a learning disability. (Pls.' 56.1 Statement ¶ 8.)

**F. Indictment and Dismissal**

On June 18, 2012, a Nassau County Grand Jury indicted plaintiffs for robbery in the second degree, New York Penal Law § 160.10, and criminal possession of a weapon in the fourth degree, New York Penal Law § 265.01. (Grand Jury Indictment, Fernandez Decl., Ex. F, ECF No. 42.) Morgan, Saperstein, and the other criminal defendant all testified before the grand jury.[5] (Morgan Tr.; Saperstein Tr.)

Plaintiffs' indictment was dismissed on September 17, 2012. (Pls.' 56.1 Statement ¶ 14.) However, nothing in the record indicates why the indictment was dismissed.

**G. The "Alibi Evidence"**

In their moving papers, plaintiffs refer to several pieces of allegedly exculpatory evidence. Specifically, plaintiffs mention: (1) a McDonald's receipt bearing a time stamp of 1:17 a.m.; (2) surveillance footage from the McDonald's showing the plaintiffs and bearing a time stamp of 1:20–1:26 a.m.; and (3) surveillance footage along the route from plaintiff Morgan's house to the McDonald's on Front Street showing the plaintiffs (collectively, the "alibi evidence"). If such

---

[5] The record includes only excerpts of the grand jury testimony from the criminal defendants. The record does not include any grand jury testimony from other witnesses, such as police officers, who may have testified. Plaintiffs have moved to compel production of the complete grand jury transcript. See supra II.A.

evidence did, in fact, exist, it would support an alibi for plaintiffs. Plaintiffs could not have conducted the attempted armed robbery at Locust and Front Street at 1:24 a.m. if they were at the McDonald's from 1:20 a.m. until 1:26 a.m. (See 911 Tr. at 1:3–4, 3:17–19.)

Neither the receipt nor any of the surveillance footage is in the record. Instead, plaintiffs cite to various pieces of indirect evidence concerning the receipt and surveillance footage. For example, Morgan testified, in the grand jury, that defendant Detective Frank Ruvolo told Morgan that he had seen the McDonald's surveillance video and that the plaintiffs were on the video. The Court will address this evidence more fully below, in the discussion of plaintiff's malicious prosecution claim.[6] See infra II.D.4.i.

## H. Procedural History

Plaintiffs Morgan and Saperstein commenced this action on November 25, 2013. (Compl., ECF No. 1.) Plaintiffs bring claims against the County of Nassau, Michael J. Leone, Matthew Fusaro (named as "Frank" Fusar in the complaint), "Michael" McGar, John Does 1–12, Frank A. Ruvolo, Edward Jacobsen (named as "Joe" Jacobson in the complaint), Richard Roes 1–12, and Kathleen Rice (collectively, the "County defendants"). Plaintiffs assert violations of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.[7] Specifically, plaintiffs contend: (1) that they were falsely arrested and imprisoned, in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments; (2) that they were maliciously prosecuted in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments;

---

[6] There is no evidence in the record indicating that the police were aware of any of the alleged alibi evidence when they arrested the plaintiffs, see infra II.C.5 and II.D.4.i, so this evidence has no bearing on plaintiffs' false arrest and imprisonment claims.

[7] In addition to their § 1983 claims, plaintiffs initially brought several state tort law claims against the County defendants. Plaintiffs, however, have since withdrawn those claims. (Pls.' Opp'n to Defs.' Proposed Rule 56 Motion, ECF No. 23.)

(3) that their rights to freedom of speech and association were infringed in violation of the First and Fourteenth Amendments; and (4) that they were subjected to unreasonable searches in violation of the Fourth and Fourteenth Amendments.

This case was initially assigned to District Judge Joseph F. Bianco and Magistrate Judge Gary R. Brown.  On February 25, 2014, Judge Brown issued a Scheduling Order setting October 31, 2014 as the deadline for completion of all discovery.  (ECF No. 13.)  On May 15, 2014, plaintiffs submitted a letter asking the Court to adjourn a settlement conference because certain records related to the "underlying criminal prosecution" had not been provided.  (ECF No. 15).  Plaintiffs, however, never filed a motion to compel before Judge Brown to obtain such records.  On September 19, 2014 defendants filed a letter motion to compel plaintiffs to furnish "complete and satisfactory responses to County Defendants First Combined Demands."  (ECF No. 20.)  This letter motion was withdrawn on September 23, 2014 after the parties conferred and agreed to a new deadline for production of those responses.  (ECF No. 21.)  Discovery then closed on October 31, 2014.  During discovery, plaintiffs never moved to compel defendants to produce any discovery, including the "alibi evidence" or any evidence related to the post-arrest investigation of plaintiffs.  It also appears that plaintiffs never deposed the County defendants or Harris, the victim.

On November 21, 2014, defendants submitted a pre-motion conference letter to Judge Bianco requesting leave to file a motion for summary judgment.  (ECF No. 22.)  Plaintiffs opposed in a letter dated December 15, 2014.  (ECF No. 23.)  Plaintiffs' opposition rested on the merits of each of their claims and did not mention any outstanding discovery requests.  (Id.)  After a conference held on December 16, 2014, Judge Bianco set a briefing schedule for defendants' motion for summary judgment and scheduled oral argument on the motion.  (ECF No. 24.)  The case was then reassigned to the undersigned on January 16, 2015.

Defendants appear to have served their summary judgment motion on plaintiffs on January 20, 2015. (ECF No. 40.) Plaintiffs submitted a letter on April 17, 2015, requesting an adjournment of the briefing schedule, citing plaintiffs' counsel's health. (ECF No. 27.) This request did not mention any outstanding discovery issues. The Court granted plaintiffs' request and adjourned oral argument indefinitely, to be scheduled only if necessary. Plaintiffs then requested eight more adjournments of the briefing schedule, extending the deadline for the fully briefed motion to March 15, 2016. (ECF No. 36.) Plaintiffs cited various reasons for the requested extensions, but did not once mention outstanding discovery issues.

On March 2, 2016, plaintiffs submitted a cross-motion for summary judgment. This cross-motion included, inter alia, several motions to compel the production of evidence from defendants. Plaintiffs also moved to amend the complaint to name new defendants in the place of certain "John Doe" and "Richard Roe" defendants.

On May 9, 2016, defendants filed additional briefing for the various motions filed by the parties. (ECF Nos. 40–45.) Then, after requesting four more extensions, plaintiffs filed additional briefing on September 22, 2016. (ECF No. 51–52.)

After reviewing the submissions in the pending motions, the Court noticed that defendants' opening brief in support of their summary judgment motion was missing several pages. (ECF No. 43.) At a conference with all parties, the Court ordered defendants to submit the omitted pages and permitted plaintiffs an opportunity to respond to the arguments contained therein. (ECF No. 55.) This additional briefing was completed on December 27, 2016.

## II. DISCUSSION

### A. Plaintiffs' Motion to Reopen Discovery and Motions to Compel

Plaintiffs have asked the Court to reopen discovery and stay decision on the summary

judgment motions. In particular, plaintiffs move to compel defendants to produce: (1) the alibi evidence; and (2) materials related to the post-arrest investigation and decision to dismiss the indictment against plaintiffs, including the complete grand jury testimony (collectively, the "post-arrest investigation evidence"). Plaintiffs allege that defendants have "concealed" these materials. (Pls.' Att'y Aff. in Reply ¶ 1, ECF No. 51.) Plaintiffs also request an opportunity to depose the defendants, who apparently were never deposed during discovery.

Plaintiffs also argue that, if the Court denies their request to reopen discovery, the Court should draw an adverse inference against defendants because of their non-production of the alibi and post-arrest investigation evidence. Plaintiffs also request that defendants' affirmative defenses be stricken because of defendants' alleged discovery violations.

Defendants oppose plaintiffs' discovery motions, arguing: (1) that plaintiffs have failed to demonstrate good cause why discovery should be reopened and (2) that plaintiffs have not established that defendants failed to comply with their discovery obligations.

The Court denies plaintiffs' request to reopen discovery because plaintiffs have failed to demonstrate good cause. Additionally, the Court declines to draw an adverse inference against defendants or to strike defendants' affirmative defenses.

### 1. Standard

Federal Rule of Civil Procedure 16(b)(4) permits a Court to modify an existing scheduling order "only for good cause . . . ." Fed. R. Civ. P. 16(b)(4). "A finding of good cause depends on the diligence of the moving party." Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003) (citing Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000)); see also Rent-A-Center Inc. v. 47 Mamaroneck Ave. Corp., 215 F.R.D. 100, 104 (S.D.N.Y. 2003) ("In other words, the movant must show that deadlines cannot be reasonably met despite its diligence."). In the

exercise of its discretion under 16(b), a court may also consider prejudice to the non-moving party. Kassner v. 2d Ave. Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007). District courts regularly deny proposed modifications of scheduling orders that would require the reopening of discovery. See, e.g., Kenny v. Cty. of Suffolk, 05-CV-6112, 2008 WL 4936856, at *1–2 (E.D.N.Y. Nov. 17, 2008) (declining to reopen discovery where counsel had "ample opportunity to pursue discovery" but made a motion to reopen discovery ten months after the discovery deadline); cf. Grochowski, 318 F.3d at 86 (affirming denial of leave to amend complaint under Rule 16 when movant had delayed over a year, discovery was complete, and a summary judgment motion was pending); Morritt v. Stryker Corp., 973 F. Supp. 2d 177, 194–96 (E.D.N.Y. 2013) (finding prejudice where proposed amended complaint would require further discovery, discovery was already complete, and summary judgment motion was pending).

### 2. Plaintiffs Have Not Demonstrated Good Cause to Reopen Discovery

Pursuant to Judge Brown's February 24 Scheduling Order, discovery closed on October 31, 2014. (ECF No. 13.) Plaintiffs did not move to compel production of additional discovery until March 2, 2016. (ECF No. 37.)

Plaintiffs have failed to demonstrate good cause because they were not diligent in their pursuit of the requested discovery. Plaintiffs communicated with the Court numerous times during the discovery period and after it closed, but waited over a year and half to raise the instant discovery requests. (See ECF Nos. 15, 23, 26, 27, 28, 29, 30, 32, 33, 35, 36, 37.) Plaintiffs had "ample opportunity to pursue discovery;" they were simply delinquent in doing so. See Kenny, 2008 WL 4936856, at *2. Furthermore, because the discovery deadline has already passed and defendants have submitted a motion for summary judgment, the Court finds that reopening discovery at this point would unduly prejudice defendants. See Morritt, 973 F. Supp. 2d 177.

Accordingly, plaintiffs' motions to reopen discovery and compel defendants to produce additional evidence are denied.[8]

### 3. Plaintiffs' Requests for an Adverse Inference and Motion to Strike Defendants' Defenses are Denied

In the event their discovery motions are denied, plaintiffs request an adverse inference against defendants based on their alleged failure to produce the alibi and post-arrest investigation evidence. Plaintiffs also request that defendants' affirmative defenses be stricken.

To the extent that plaintiffs contend that defendants engaged in spoliation, that argument is meritless. Plaintiffs offer no evidence that defendants have destroyed relevant evidence that was in their possession.[9]

Plaintiffs also assert that they are entitled to an adverse inference because defendants allegedly breached their discovery obligations by not adequately responding to plaintiffs' discovery demands. This argument is similarly meritless.

Once plaintiffs served their discovery requests on defendants, defendants had thirty days to respond or object to those requests. Fed. R. Civ. P. 34(b)(2)(A) & (C). There is no dispute that defendants' objections to plaintiffs' requests were timely. If plaintiffs wished to pursue the requested discovery over defendants' objections, plaintiffs should have moved to compel pursuant to Rule 37 before the deadline to complete discovery. Plaintiffs failed to do so during the discovery period. Instead, plaintiffs first moved to compel in their cross-motion for summary judgment, filed

---

[8] The Court also notes several procedural deficiencies in plaintiffs' discovery motions that further support the Court's decision to deny the requested relief. Specifically, it is undisputed that plaintiffs: (1) did not attempt to meet and confer with defendants prior to moving to compel as required by FRCP 37(a)(1) and Local Rule 37 and (2) failed to request a pre-motion conference as required by the Court's Individual Rules IV.B.

[9] At one point in their moving papers, plaintiffs claim that the McDonald's receipt was taken from them the morning of the arrest and "presumably destroyed [by defendants] since it was exculpatory." (Pls.' 56.1 Statement ¶ 5.) However, there is no evidence in the record that the police destroyed the McDonald's receipt or that such a receipt was ever in the possession of the police. For further discussion of the McDonald's receipt, see <u>infra</u> II.D.4.i.

on March 2, 2016, more than one year and five months after discovery had closed.  (ECF Nos. 13 & 37.)  The notion that plaintiffs should receive an adverse inference, or that the Court should strike defendants' affirmative defenses, when plaintiffs failed to timely pursue a motion to compel is absurd.  The Court denies plaintiffs' request for an adverse inference and motion to strike defendants' affirmative defenses.

In light of the Court's decision to deny plaintiffs' motion to reopen discovery, motions to compel, and request for an adverse inference, the Court will decide the pending summary judgment motions on the record currently before it.

## B.  Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . ."[10]

---

[10]  As explained below, the Court is granting defendants' motion for summary judgment.  Accordingly, the Court has analyzed all of the evidence in the light most favorable to plaintiffs.

Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the non[-]moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate. Anderson, 477 U.S. at 249.

## C. **False Arrest and Imprisonment Claims**

The police officer defendants assert that they are entitled to qualified immunity on plaintiffs' false arrest and imprisonment claims.[11] Defendants argue that they had probable cause—or in the alternative, arguable probable cause—to arrest the plaintiffs. Plaintiffs oppose and cross-move for summary judgment on these claims. Plaintiffs argue that the differences between Harris's initial 911 description and plaintiffs' appearance at the time of the show-up identification and arrest, along with plaintiffs' alibi, establish that arguable probable cause did not exist at the time of the arrest.

The Court concludes that the individual officers are entitled to qualified immunity because under the totality of the circumstances there was probable cause to arrest the plaintiffs. The Court

---

[11] "False arrest and false imprisonment are largely synonymous because an imprisonment starts at the moment of arrest." Jenkins v. City of New York, 478 F.3d 76, 88 n.10 (2d Cir. 2007) (quoting 59 N.Y. Jur. 2d False Imprisonment § 1). Because the existence of probable cause is an also an absolute defense to a false imprisonment claim and arguable probable cause establishes an individual officer's qualified immunity to a false imprisonment claim, id. at 84, 88 n.10, the Court's analysis applies with equal force to plaintiffs' false imprisonment claim.

further finds that even if the plaintiffs lacked probable cause, the individual officers would still be entitled to qualified immunity because, at the very least, there was arguable probable cause to affect the arrest.

## 1. Standard

A plaintiff cannot prevail on a claim for false arrest if the defendant had probable cause to arrest the plaintiff. Jaegly v. Couch, 439 F.3d 149, 151–52 (2d Cir. 2006). The Court assumes arguendo that defendants bear the burden of proving that there was probable cause for plaintiffs' arrests. Blau v. Suffolk Cty., No. 11-CV-4818, 2016 WL 426515, at *3 (E.D.N.Y. Feb. 3, 2016).

Probable cause exists where "the arresting officer [has] knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (quoting Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995)). A court evaluates the existence of probable cause in light of the totality of the circumstances. Kent v. Katz, 312 F.3d 568, 576 (2d Cir. 2002).

"Under federal law, a police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act.'" Jenkins, 478 F.3d at 87 (quoting Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001)). The critical inquiry here is whether the arresting officers' determination that they had probable cause to arrest was objectively reasonable. "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" Jenkins, 478 F.3d at 87 (quoting Lennon v. Miller, 66 F.3d 416, 423–24 (2d Cir.

1995)); see also Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) ("[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986))). To determine whether an officer's conduct was objectively reasonable, a court considers the information available to the officer and does not inquire into the officer's subjective intent. Conn. ex rel. Blumenthal v. Crotty, 346 F.3d 84, 106 (2d Cir. 2003).

"[A] court considering a summary judgment motion in a false-arrest or malicious-prosecution case must construe in favor of the non-moving party any factual disputes regarding what circumstances were known to the officer at the relevant time." Benn v. Kissane, 510 F. App'x 34, 37 (2d Cir. 2013). "After that, however, the court must undertake a neutral, legal analysis of whether those (assumed) circumstances satisfy the probable-cause standard." Id. (citing Jenkins, 478 F.3d at 88. "In other words, the court should resolve in favor of the non-moving party any disputes about what information the officer knew, but it should neutrally determine whether that information gave rise to probable cause." Id. (emphasis in original).

### 2. Plaintiffs Were Arrested After the Show-Up Identification

Before turning to the question of probable cause, the Court addresses the timing of the arrest. As noted in the Background section, plaintiffs' affidavits state, in conclusory fashion, that they were "arrested" before the search of the vehicle and the show-up identification occurred. Plaintiffs, however, do not argue that the timing of the arrest is material to the question of probable cause. Specifically, plaintiffs fail to argue that the Court should not consider the show-up because it occurred subsequent to the arrest.

In any event, the Court has reviewed the record and concludes, as a matter of law, that the actions preceding and including the show-up identification were consistent with police conduct during an investigatory stop, not an arrest. See Dempsey v. Town of Brighton, 749 F. Supp. 1215,

1221–22 (W.D.N.Y. 1990) (finding, at summary judgment, that "it [wa]s clear" that brief handcuffing of suspect, pat down of suspect, and transportation of suspect to nearby crime scene for show-up identification concerning alleged armed robbery was not "tantamount" to an arrest, but rather was an investigatory stop), aff'd sub nom. Curenton v. Town of Brighton, 940 F.2d 648 (2d Cir. 1991); Gil v. Cty. of Suffolk, 590 F. Supp. 2d 360, 367–68 (E.D.N.Y. 2008) (finding that detaining suspect in handcuffs for seventeen minutes did not elevate investigatory stop to an arrest). Accordingly, it is appropriate for the Court to consider the show-up in determining whether there was probable cause for the arrest.

### 3. The Individual Officers Had Probable Cause For The Arrest

Defendants argue that the individual officers had probable cause, or in the alternative, arguable probable cause, to arrest plaintiffs. The Court agrees and finds that the officers had probable cause to arrest plaintiffs based on Harris's show-up identification. In any event, even if there was not probable cause, there was certainly arguable probable cause to arrest plaintiffs. See Hargroves v. City of New York, 411 F. App'x 378, 384 (2d Cir. 2011) ("[The Court cannot say that the officers] acted incompetently or in knowing violation of the law in believing they had probable cause to arrest the plaintiffs once they had been visually identified by the victim.").

"Ordinarily, the identification, by an eyewitness, of a suspect will likely be sufficient to establish probable cause for an arrest." Id. at 383 (citing Russo v. City of Bridgeport, 479 F.3d 196, 199, 204 (2d Cir. 2007)). A number of courts have found probable cause and arguable probable cause based on show-up identifications similar to the one conducted here. See id. 383–84 (concluding that, in the absence of circumstances that "raise doubts as to the victim's veracity," a show-up identification by a victim is sufficient to establish arguable probable cause (quoting Singer, 63 F.3d at 119)); Sorrell v. Cty. of Nassau, 162 F. Supp. 3d 156, 166–67 (E.D.N.Y. 2016)

(finding show-up was not "so suggestive such that it could not provide probable cause for arrest");

Gil, 590 F. Supp. 2d at 364, 368–69 (finding that the "evidence [did] not suggest that the show-up identification was so flawed as to undermine probable cause").

Plaintiffs argue that a show-up identification made under circumstances in which a complainant's initial description and a plaintiff's actual appearance differ cannot establish probable cause.[12]   However, the cases cited above illustrate that show-up identifications may establish probable cause even where a complainant's earlier description of his assailant differs from a suspect's actual appearance at the time of the identification.   In Hargroves, the Second Circuit affirmed a district court's finding of probable cause based on a show-up identification, despite the fact that the victim had initially described his assailants as a large group of black males, one of whom was wearing an orange coat, when plaintiff was actually wearing a red and blue coat and was observed amidst a large group of black males.   411 F. App'x at 383–84.   In Gil, the court found a show-up identification provided probable cause to arrest even though the actual appearance of an arrestee differed significantly from the initial description provided to police by the complainant.   590 F. Supp. 2d at 363–64, 368–69 (concluding show-up established probable cause even where complainant had initially described the suspect as short (5'2"), wearing a mask and a blue hooded sweatshirt, and the plaintiff was actually tall (5'9") and wearing a black knit earwarmer and black hooded sweatshirt).   The differences between the complainant's initial description and the plaintiffs' appearance at the time of arrest were even starker in Sorrell.   162 F.

---

[12] The parties dispute which description provided by Harris—i.e., the 911 Transcript, the Police Radio Communications, or the in-person description—should govern the Court's analysis.   The Court notes that the Second Circuit has rejected the notion that exculpatory information known to one police officer can be imputed to other officers.   Savino v. City of New York, 331 F.3d 63, 74 (2d Cir. 2003) ("[The collective knowledge] doctrine cannot be used to impute to an officer 'facts known to some [other] members of the police force which exonerate an arrestee.'" (emphasis in original) (quoting United States v. Valez, 796 F.2d 24, 28 (2d Cir. 1986))).   In any event, the question of which description should govern is ultimately immaterial because the Court finds that even the most divergent initial description—the 911 Transcript—is not so different from plaintiffs' appearance as to undermine probable cause.

Supp. 3d at 161–62, 166–67.  In <u>Sorrell</u>, the victim of an armed robbery initially described her assailants as three people—one man and two women—who were black, in their twenties, and in a white four-door Honda sedan.  The victim further described:  (1) the man as tall, chubby, and wearing all black and a black doo-rag; (2) one of the women as wearing a white shirt and jeans with "nappy hair worn up"; and (3) the other woman as wearing a pink shirt, jeans, a lot of jewelry, and also with "nappy hair worn up."  <u>Id.</u> at 161–62.  When the victim arrived at the scene to conduct a show-up identification, she was shown four black suspects who had been observed in a white four-door Honda sedan.  One of the men was wearing a black t-shirt with a design on the front, one of the women was wearing a white shirt with pink lettering, and the other woman was wearing a black t-shirt and a dark blue sweatshirt.  Neither woman had on visible jewelry, nor did they have their hair up.  Despite the differences between the initial description and plaintiffs' actual appearance, the district court concluded that the show-up was sufficient to establish probable cause.  <u>Id.</u> at 166–67.

Plaintiffs also argue that the show-up identification conducted here was "unduly suggestive," and, thus, could not be a basis for probable cause.  Specifically, plaintiffs contend the show-up was suggestive because: (1) each plaintiff was presented to Harris one at a time; (2) the plaintiffs were handcuffed; (3) and "no doubt [Harris had been told] 'We have the guys' in some form . . . ."  (Att'y Aff. ¶ 20.)  These arguments are meritless.  First, the isolated presentation of each suspect is an inherent feature of most show-ups and is not enough to show that the show-up was unduly suggestive.  <u>See</u> <u>Sorrell</u>, 162 F. Supp. 3d at 166 (citing <u>Brisco v. Ercole</u>, 565 F.3d 80, 88 (2d Cir. 2009)).  Second, the mere presence of handcuffs does not render a show-up impermissible.  <u>See</u> <u>Gil</u>, 590 F. Supp. 2d at 364 (citing <u>People v. Armstrong</u>, 783 N.Y.2d 134, 136 (3d Dep't 2004)).  Finally, plaintiffs' suggestion that the police told Harris that they "ha[d] the

guys" is not supported by any evidence in the record.

In light of the cases above, the Court concludes that defendants had either probable cause or arguable probable cause to arrest the defendants based on the show-up identification. This conclusion is supported by the other facts available to the police at the time of the arrest: police observed the plaintiffs in close proximity to the crime scene, minutes after the crime occurred, idling in a car, late at night, while one of the passengers was wearing a black ski mask.

### 4. Admissibility of the Show-Up Identification

The Court also notes that, at certain points in their moving papers, both parties seem to suggest that the question of whether the show-up identification established probable cause turns on whether the show-up identification would have been admissible in a criminal prosecution.[13] The admissibility of show-up identifications in criminal proceedings is governed by the two-prong test set out in Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001). "[I]dentification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." Id. (colleting cases).

"While a show[-]up procedure is inherently suggestive because it involves the presentation of a single suspect to a witness by the police," it is only inadmissible and violative of due process where it is "unnecessarily suggestive." Brisco, 565 F.3d at 88 (emphasis in original) (internal quotation marks omitted). An identification may be unnecessarily suggestive if it is based on procedures that "create 'a very substantial likelihood of irreparable misidentification.'" Id.

---

[13] In the malicious prosecution context, the Second Circuit has wrestled with the question of how to evaluate probable cause premised on evidence that would be inadmissible in a criminal proceeding. See Restivo v. Hessemann, -- F.3d --, at *14 (2d Cir. Jan. 19, 2017) ("[We have not held] that inadmissible evidence cannot be used in evaluating probable cause for a [malicious prosecution claim], but only that where the sole evidence of a defendant's guilt is a single statement that police would have understood at the time could not be used in a criminal case . . . such evidence is not alone sufficient to defeat a malicious prosecution claim."); Boyd v. City of New York, 336 F.3d 72 (2d Cir. 2003). Here, the show-up was not the only basis for probable cause. Moreover, the unsettled nature of this legal question is further reason to conclude that the officer defendants would be entitled to qualified immunity even if the show-up would be inadmissible.

(quoting <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968)). "Even if an identification procedure is unduly suggestive, the out-of-court identification may nonetheless be admissible if other factors indicate that the identification is independently reliable." <u>Id.</u> at 89. Whether an identification has independent reliability is determined by analyzing the five factors laid out by the Supreme Court in <u>Neil v. Biggers</u>:

- The opportunity of the witness to view the criminal at the time of the crime,

- The witness' degree of attention,

- The accuracy of the witness' prior description of the criminal,

- The level of certainty demonstrated by the witness at the confrontation, and

- The length of time between the crime and the confrontation.

409 U.S. 188, 199–200 (1972).

Ultimately, the Court does not have to resolve the question of whether the above test for admissibility should also control the determination of probable cause because, even assuming that it does, the show-up identification is admissible. First, the show-up identification here was not unnecessarily suggestive. <u>See</u> <u>Brisco</u>, 565 F.3d at 90 (denying habeas petition where the New York Court of Appeals concluded that a show-up that "took place at the scene of the crime, within an hour of the commission of the crime, and in the context of a continuous, ongoing investigation" was admissible). And, even assuming the show-up was unnecessarily suggestive, it would still be admissible under <u>Biggers</u> because it was independently reliable. In particular, Harris's opportunity to view his assailants (who came right up to his car) and the close proximity in time between the crime and identification weigh in favor of reliability. <u>See, e.g.</u>, <u>id.</u> at 92 ("[T]here is no presumption that an eyewitness who gives a description had an inadequate opportunity to observe the elements that make up that description."); <u>id.</u> at 94 (concluding show-up identification was

independently reliable when, <u>inter alia</u>, it was conducted one hour and ten minutes after the crime and collecting similar cases).

### 5. Plaintiffs Remaining Arguments Concerning Probable Cause Are Unpersuasive

Plaintiffs argue that Harris's initial description was too general to support a finding of probable cause. Plaintiffs cite several cases for the proposition that "when [a] description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist." <u>Jenkins</u>, 478 F.3d at 90 (collecting cases). These cases, however, are distinguishable from the case at bar because none of them involved a pre-arrest show-up identification, which contributed to the officers' finding of probable cause. Even if the Court were to ignore the show-up, the facts of this case would still be distinguishable. Unlike those cases—where police officers relied on general broadcast descriptions of suspects to establish probable cause—here, the police officers relied on much more information specific to the plaintiffs. The Court finds that the undisputed facts known to the police officers before the show-up identification—i.e., that the arrestees were three passengers, whose clothing somewhat matched Harris's description, sitting in an idling car, at night, in close proximity to the site of the attempted robbery, and one of whom was wearing a ski mask—amount to, at least, arguable probable cause.

Plaintiffs also argue that the individual officers could not have had probable cause to arrest the plaintiffs because of the "irreconcilable difference[s]" between Harris's initial description of the plaintiffs and their actual appearance. (Pls.' Att'y Aff. in Opp'n to Mot. and in Supp. of Cross-Mot. ("Att'y Aff.") ¶ 7, ECF No. 37.) In particular, plaintiffs contend that the plaintiffs differed in their race, mode of transportation, clothing, and choice of gun as compared to Harris's description. (Pls.' Superceding Mem. at 12–13.) Plaintiffs rely on <u>Jenkins</u>, <u>Weyant v. Okst</u>, 101 F.3d 845 (2d Cir. 1996), and several other decisions in which courts found probable cause lacking

when descriptions of suspects differed from arrestees' actual appearances. Again, these cases are distinguishable because they do not involve a pre-arrest show-up.[14]

Additionally, plaintiffs argue that the "alibi evidence" and the undisputed fact that plaintiffs were eating when they were initially detained leads to the conclusion that no reasonable officer could have found probable cause to arrest the plaintiffs. The Court disagrees. First, there is no evidence in the record to support the contention that the individual officers possessed (or even knew about) the "alibi evidence" at the time of the arrest.[15] Second, the fact that plaintiffs were eating when they were detained does not undermine probable cause in light of the other facts available to the officers at the time of the arrest—i.e., a positive show-up identification coupled with police observation of the plaintiffs in close proximity to the crime scene, minutes after the crime occurred, idling in a car, late at night, while one of the passengers was wearing a black ski mask.

Plaintiffs also argue that no reasonable police officer would have conducted a show-up identification under the circumstances. This argument is meritless. See, e.g., Hargroves, 411 F. App'x at 383–84; Sorrell, 162 F. Supp. 3d at 166–67; Gil, 590 F. Supp. 2d at 368–69.

Additionally, plaintiffs argue: (1) that later dismissal of the indictment necessarily means that there was no probable cause to arrest the plaintiffs and (2) that defendants' failure to address the alibi evidence in their briefing means it must necessarily undermine probable cause. These

---

[14] Jenkins explicitly recognized a distinction between an arrest based solely on a victim's description and an arrest based on a victim identification during a line up. The court in Jenkins acknowledged that, although the police lacked probable cause based on the victims' description, which did not match the arrestee's actual appearance, a later line-up identification by victims did establish probable cause. 478 F.3d at 91–93.

[15] It is unclear whether plaintiffs' argument concerns the specific "alibi evidence" defined earlier—i.e., the McDonald's receipt and surveillance footage—or whether plaintiffs' argument merely concerns the fact that plaintiffs were eating food from McDonald's at the time they were observed by police. In any event, as explained infra, II.D.4.i, there is no evidence that the police possessed the "alibi evidence" prior to the arrest and so, the existence of the receipt and surveillance footage have no bearing on the question of whether there was probable cause to arrest.

arguments are utterly meritless.

In light of the Court's conclusions above, the Court grants defendants' motion for summary judgment and denies plaintiffs' cross-motion for summary judgment on plaintiffs' false arrest and false imprisonment claims.

### D. **Malicious Prosecution Claim**

#### 1. **Standard for Malicious Prosecution**

To survive summary judgment on a malicious prosecution claim, a plaintiff must demonstrate: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003) (quoting Colon v. City of New York, 60 N.Y.2d 78, 82 (1983)). The existence of probable cause is a complete defense to a claim of malicious prosecution. Id. (citing Colon, 60 N.Y.2d at 82). Furthermore, "indictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Id. (emphasis in original) (quoting Colon, 60 N.Y.2d at 83).

#### 2. **The Parties' Arguments**

Defendants argue that summary judgment should be granted on plaintiffs' malicious prosecution claim because a grand jury indictment creates a presumption of probable cause. Defendants maintain that plaintiffs have failed to adduce any evidence suggesting officer misconduct here and, thus, cannot rebut the presumption.

Plaintiffs appear to raise two arguments in defense of their malicious prosecution claim. First, plaintiffs appear to argue that the presumption of probable cause does not apply when an indictment is dismissed pursuant to New York Criminal Procedure Law § 210.35(5). Second,

plaintiffs contend that the police officers engaged in misconduct and failed to conduct a proper investigation, which, according to plaintiffs, rebuts the presumption of probable cause.

As explained below, plaintiff's arguments are meritless. The Court agrees with defendants that the presumption of probable cause applies here and that plaintiffs have failed to rebut that presumption.

### 3. Dismissal of the Indictment Does Not Eliminate the Presumption of Probable Cause

At one point, plaintiffs seem to suggest that the presumption of probable cause is inapplicable any time that an indictment is dismissed. This argument is meritless. Soto v. City of New York, 132 F. Supp. 3d 424, 454 (E.D.N.Y. 2015) (concluding "New York courts have generally recognized that dismissal of an indictment does not negate the presumption of probable cause" and collecting cases).

Plaintiffs also appear to argue that the presumption of probable cause does not apply when an indictment is dismissed pursuant to § 210.35(5). As a threshold matter, this argument fails because plaintiffs have not offered any evidence showing that the indictment at issue here was, in fact, dismissed pursuant to § 210.35(5). Moreover, even if the indictment was dismissed under that provision, the presumption of probable cause would still apply. Section 210.35(5) is a "catch all" provision "permitting the 'exceptional remedy' of dismissal in 'those instances where prosecutorial wrongdoing, fraudulent conduct or errors potentially prejudice the ultimate decision reached by the Grand Jury.'" Soto, 132 F. Supp. 3d at 453–54 (quoting People v. Huston, 88 N.Y.2d 400, 409 (1996)). Plaintiffs do not cite any authority indicating that the presumption of probable cause does not apply when an indictment is dismissed under § 210.35(5). In fact, one court has explicitly ruled to the contrary. See id. at 455–56 (applying presumption of probable cause where indictment was dismissed pursuant to § 210.35(5)).

The Court concludes that dismissal of the indictment does not eliminate the presumption of probable cause.

### 4. Plaintiffs' Allegations of Police Misconduct and Negligent Investigation are Insufficient to Rebut the Presumption of Probable Cause

The presumption of probable cause may be rebutted <u>only</u> by evidence that "the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" <u>Savino</u>, 331 F.3d at 72 (quoting <u>Colon</u>, 60 N.Y.2d at 82). To rebut the presumption, a plaintiff must demonstrate that a police officer "misled" the prosecutor and trial judge. <u>Hargroves</u>, 411 F. App'x at 386. "[A] mistake alone is not enough to suggest, much less show, that defendants 'lied' to the prosecutors or the judge about what they saw." <u>Id.</u> (finding that police officer's mistaken description of plaintiff's jacket was not evidence of bad faith). Similarly, negligence in an investigation or sloppy police work does not rise to the level of misconduct sufficient to rebut the presumption. <u>Gil</u>, 590 F. Supp. 2d at 370 ("Any alleged failure to conduct further investigation [into a defendant's alibi] or apply all procedures that could have been followed does not amount to fraud, bad faith, or the suppression of evidence and is insufficient to overcome the presumption." (citing <u>Colon</u>, 60 N.Y.2d at 83, <u>Lee v. City of Mount Vernon</u>, 49 N.Y.2d 1041 (1980), & <u>Santiago v. City of Rochester</u>, 796 N.Y.S.2d 811, 812 (4th Dep't 2005))); <u>Richards v. City of New York</u>, No. 97-CV-7990, 2003 WL 21036365, at *16 (S.D.N.Y. May 7, 2003) ("[T]he police are not obligated to pursue every lead that may yield evidence beneficial to the accused, even though they had knowledge of the lead and the capacity to investigate it." (citing <u>Gisondi v. Town of Harrison</u>, 72 N.Y.2d 280, 285 (1988))). Moreover, "where a plaintiff offers merely his version of events to rebut the presumption, this is nothing more than 'mere conjecture and surmise that [the plaintiff's] indictment was procured as a result of conduct undertaken by the defendants in bad faith,'" which is insufficient to rebut the presumption. <u>Soto</u>, 132 F. Supp. 3d

at 456 (quoting <u>Savino</u>, 331 F.3d at 73).

In their moving papers, plaintiffs repeatedly accuse defendants of secreting evidence, in particular the alibi and post-arrest investigation evidence. Plaintiffs also argue that the police investigation into the alibi evidence was sloppy and negligent.

### i. The Alibi Evidence

Plaintiffs cite to the alleged "alibi evidence." Again, the "alibi evidence" consists of: (1) a McDonald's receipt bearing a time stamp of 1:17 a.m.; (2) surveillance footage from the McDonald's showing the plaintiffs and bearing a time stamp of 1:20–1:26 a.m.; and (3) surveillance footage along the route from plaintiff Morgan's house to the McDonald's on Front Street showing the plaintiffs.

As noted earlier, neither the receipt nor any of the surveillance footage are part of the record. Instead, plaintiffs cites various pieces of indirect evidence concerning the receipt and the surveillance footage.

The critical questions surrounding the alleged alibi evidence are: (1) does this evidence exist?; (2) if so, what exactly does this evidence show?; (3) did the police ever obtain this evidence?; (4) if so, when was the evidence obtained by the police?; (5) to the extent the police possessed such evidence, did they provide the evidence to the prosecutor?; and (6) did the police commit any misconduct, such as perjury, before the grand jury concerning this evidence?

As explained below, at best, plaintiffs can show that the police became aware of some of the alleged alibi evidence after they arrested plaintiffs. Plaintiffs, however, cannot establish that the police committed any misconduct concerning the alleged alibi evidence. The three categories of alibi evidence are each discussed fully below.

With respect to the McDonald's receipt, there is insufficient evidence from which a juror

could conclude that this receipt ever existed.  More importantly, even if a juror could conclude that a McDonald's receipt existed, there is no evidence in the record indicating: (1) the information listed on the receipt; or (2) that the police ever had this receipt in their possession.  Furthermore, even assuming arguendo that the police possessed the receipt, there is no evidence that they failed to provide it to the prosecutor or testified falsely about it in the grand jury.[16]

With respect to the McDonald's surveillance footage, a jury could conclude that:  (1) there was McDonald's surveillance footage of the plaintiffs; (2) this footage showed the plaintiffs receiving food from 1:20 a.m. to 1:26 a.m.; and (3) the police obtained this footage after the plaintiffs' arrest, but before the plaintiffs were indicted.  There is, however, no evidence indicating that the police failed to turn this McDonald's footage over to the prosecutor.  Nor is there any

---

[16]  Plaintiffs' 56.1 Statement asserts that "the McDonald's receipt, showing the time of purchase to be 1:17 a.m., was taken from plaintiffs that morning by defendants and has not been seen since, presumably destroyed because it was exculpatory."  (Pls.' 56.1 Statement ¶ 5.)  In support, plaintiffs rely on a single exhibit—a June 5, 2012 letter sent to District Attorney Kathleen Rice from Morgan and his mother.  In that letter, Morgan and his mother briefly refer to a McDonald's receipt, writing only "[a]lso we would like the receipts from the food that was ordered . . . ."  (Letter from Jacquelyn and James Morgan to District Attorney Kathleen Rice ("June 5 Letter"), Kutner Aff., Ex. 8 at NC 000161, ECF No. 37.)  Defendants did not object to this letter.  In any event, this letter is insufficient to establish that the police ever took a receipt from plaintiffs.  Moreover, this letter says nothing about any information on the receipt, such as the time stamp on it.

evidence that police testified falsely about this footage in the grand jury.[17]

With the respect to surveillance footage from other sources along the route between Morgan's house and McDonald's, there is insufficient evidence in the record to establish that any such footage was ever obtained by either the plaintiffs or the police. More importantly, even assuming arguendo that such footage did exist and was in the possession of the police, there is no evidence that the police withheld this footage from the prosecutor or committed any other

---

[17] In support of their claims regarding the McDonald's footage, plaintiffs rely on their own grand jury testimony. Before the grand jury, Morgan testified:

> [My mother and I] called Detective Ruvalo [sic] when I got bailed out. We asked him was I seen on [the McDonald's] video. He didn't want to tell met at first. First he said, "Yes, we do have the video." I asked him did he see me on the video. He said, "Yes, we see the car in the video." I said, "I am not asking about the car. I am asking did you see me on the video." He said, "Yes. You are the one sitting in the backseat behind Jeremy." Jeremy is driving the car mind you. So at that time that is how I know they received the video.

(Morgan Tr. at 20:5–15.) When asked if he had ever seen the McDonald's surveillance video himself, Morgan responded, "No. I didn't receive the video, myself, but I was told [by a legal aide that] I was receiving the food on that camera from 1:20 to 1:26." (Id. at 31:13–19.) Surprisingly, defendants have not objected to this testimony, which appears to be clearly inadmissible hearsay.

In his grand jury testimony, Saperstein also mentioned the McDonald's video. (Saperstein Tr. at 34:23–35:4 ("Q: And your testimony, what time did you get to McDonald's, do you remember that? A: Like we did in the video that we saw.").) When asked if he had seen the video, himself, Saperstein testified: "[Morgan's attorney, Harry Kutner] told me. We were on video from 1:20 to 1:26 at McDonald's." (Id. at 35:3–4.) Again, defendants do not object to this testimony, which appears to be clearly inadmissible hearsay.

Plaintiffs also cite to the June 5 letter from the Morgans to District Attorney Rice. This letter states: "My son is on the video, as he said and this was repeated by Det. Ruvolo from the 1st Precinct." (June 5 Letter at NC 000161.) Again, defendants did not object to this letter.

misconduct concerning this footage.[18]

As the discussion above makes clear, nothing in the record indicates that the police ever withheld any alibi evidence from the prosecutor or committed any other type of misconduct concerning the alibi evidence.

Plaintiffs also argue that the individual defendants are liable for malicious prosecution because they failed to adequately investigate the alibi evidence. In their moving papers, plaintiffs "educatedly speculate[]" that the plaintiffs' indictment was ultimately dismissed once the defendants "finally conducted competent investigative work." (Pls.' Superceding Mem. at 14.) In his affidavit, Morgan states, in conclusory fashion, that the police investigation was "sloppy." Plaintiffs, however, have no evidence in support of these allegations. Moreover, plaintiffs fail to

---

[18] With respect to this alleged surveillance footage, plaintiffs rely on their grand jury testimonies and an affidavit submitted by Morgan in the underlying criminal proceeding. During his grand jury testimony, Morgan stated:

> Yesterday, I went down to Uniondale Avenue looking for cameras. I have a list of cameras here that actually shows that we was on our way going to McDonald's. At that time it has to be around 1:16, at least 1:17, because again we were receiving our food at 1:20, 1:26. Uniondale Public Library does have a video that shows the strip of the street, so it can show that we were driving by. So does the C Town, the C Town market that is also on Uniondale Avenue.

(Morgan Tr. at 21:8–17.) Morgan never explicitly states that he obtained or viewed any of this alleged footage.

Saperstein also mentioned a "red light" surveillance camera during his grand jury testimony, but, like Morgan, did not testify that he ever obtained or viewed any surveillance footage from this camera. (Saperstein Tr. at 42:9–13 ("Q: . . . So there's a few minutes that are unaccounted for, right, because you say that you got to McDonald's at 1:20, right? A: If you could see the red light camera, it's always recording.").)

Plaintiffs also cite an affidavit that Morgan submitted in the underlying criminal proceeding. In this affidavit, Morgan asserts: "Additional security videotapes obtained by Mr. Kutner fully corroborate our testimony that we left my house, drove straight to McDonald's on Front Street, ordered the food, paid for it, and were eating it in Jeremy's car in front of McDonald's when the police cars first passed us . . . ." (Morgan Aff. 7/9/12 ¶ 4.) This conclusory assertion does not identify the "videotapes" at issue, nor does it explain how these videotapes "fully corroborate" plaintiffs' story. The Court also notes that plaintiffs do not explain why they have not introduced these videotapes, if, as Morgan attests, the tapes were obtained by "Mr. Kutner," who represents plaintiffs in the instant suit.

Finally, plaintiffs once again rely on the June 5 letter from the Morgans to District Attorney Rice. This letter does not identify the content of any footage. Rather, this letter merely requests video recordings and claims what the tapes "would show." (June 5 Letter at NC 000161) This letter does not indicate that the Morgans ever viewed or possessed such recordings. (See id. ("Also we would like . . . the street camera recordings on Jerusalem and Uniondale Avenue, which would show the route that they took in order to get to McDonalds on Front Street.").)

cite any authority in support of the proposition that a negligent or sloppy investigation rises to the requisite level of bad faith to rebut the presumption of probable cause created by a grand jury indictment.  In fact, the law is to the contrary.  See Gil, 590 F. Supp. 2d at 370 (citing Colon, 60 N.Y.2d at 83; Lee, 49 N.Y.2d 1041; Santiago, 796 N.Y.S.2d at 812).

### ii. The Post-Arrest Investigation Evidence

Plaintiffs also raise the specter of misconduct concerning materials related to the post-arrest investigation and the decision to dismiss the indictment against plaintiffs.  The problem for plaintiffs is that they have absolutely no evidence concerning these issues.  As explained earlier, discovery requests concerning these issues are the subject of one of plaintiffs' motions to compel, which the Court has already denied.  Given the absence of any evidence concerning the post-arrest investigation and the decision to dismiss the indictment, plaintiffs cannot possibly show police committed misconduct, fraud or perjury concerning these materials.

Plaintiffs' remaining argument is that the unexplained dismissal of the indictment, along with the alleged concealment of post-arrest investigation evidence, leads to the "single conclusion" that the information contained therein undermines defendants' defense.  (Pls.' Superceding Mem. at 18.)  This argument is meritless.  Plaintiffs bear the burden of rebutting the presumption of probable cause.  The fact that the record does not include a reason why the indictment was dismissed is insufficient to rebut that presumption.

Ultimately, all of plaintiffs' arguments are nothing more than "mere conjecture and surmise," which are insufficient to rebut the presumption of probable cause created by the grand jury indictment.  Accordingly, the Court grants defendants' motion for summary judgment on plaintiffs' malicious prosecution claim.

### E. First Amendment Claims

Defendants argue that plaintiffs have failed to demonstrate a violation of their speech or association rights. The Court agrees.

#### 1. Standard for Free Speech Claims

To demonstrate a violation of their right to free speech, plaintiffs must show that "official conduct actually deprived them of that right." Williams v. Town of Greenbergh, 535 F.3d 71, 78 (2d Cir. 2008) (citing Colombo v. O'Connell, 310 F.3d 115, 117 (2d Cir. 2002)). A deprivation is established where: "(1) defendants silence[d a plaintiff] or (2) defendant[s'] actions had some actual, non-speculative chilling effect on [plaintiff's] speech." Id. at 78 (citing Colombo, 310 F.3d at 117)).

#### 2. Plaintiffs Have Not Demonstrated An Infringement of Their Free Speech Rights

Plaintiffs submit that their right to free speech was violated when the individual police officers tried to deter plaintiffs' "assertions of innocence" by threatening the plaintiffs and insulting them. (Pls.' Superceding Mem. at 20.) The record, however, is devoid of any evidence suggesting that plaintiffs were silenced or that their speech was chilled by the officers' conduct. According to plaintiffs, "[their] affidavits establish defendants' abusive actions which sought to stop their repeated insistence that they did nothing wrong." (Id. at 21.) However, neither Morgan nor Saperstein mention any chilling effect of the post-arrest police interview in their affidavits. (See Morgan Aff. 2/29/16; Aff. of Jeremy Saperstein dated February 29, 2016 ("Saperstein Aff. 2/29/16"), ECF No. 37) At most, Morgan's affidavit asserts: "They later took us to a Precinct and questioned us, nastily, screaming and calling Jeremy 'a retard,' for about two hours before they finally told us we were arrested for an attempted robbery. We still had no idea what they were talking about." (Morgan Aff. 2/29/16 ¶ 6.) Saperstein's affidavit fails to even mention any post-

arrest police interview.  (Saperstein Aff. 2/29/16.)

The Court has also reviewed each plaintiff's grand jury testimony and finds that neither plaintiff claims that the individual officers' actions "had some actual, non-speculative chilling effect" on his speech rights.    In fact, during his testimony, Saperstein admits that he and his co-arrestees fully participated in the post-arrest interview and informed the officers that they were innocent.  (Saperstein Tr. at 12:19–13:20 ("Then I think I'm interviewed first and I tell the story  . . . Then after that he interviewed my other two friends . . . But as soon as [the detective] found out all three of us told the same exact story about what happened, he was so pissed and he didn't know what to do.").)

Because plaintiffs have failed to demonstrate any facts from which a reasonable juror could find they were silenced or their speech rights were chilled, the Court grants defendants' motion for summary judgment on plaintiffs' free speech claims.[19]

### 3.  Standard for Association Claims

"The Supreme Court has recognized a right of association with two distinct components— an individual's right to associate with others in intimate relationships [i.e., intimate association] and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment [i.e., expressive association] . . . ."  Adler v. Pataki, 185 F.3d 35, 42 (2d Cir. 1999) (citing Roberts v. U.S. Jaycees, 468 U.S. 609, 617–18 (1984)).  In the context of a friendship, the right to intimate association is not violated "unless the challenged action has the likely effect

---

[19] Additionally, the Court notes that plaintiffs do not cite any legal authority adopting their apparently novel theory that an interrogation in which criminal defendants are deterred from professing their innocence violates rights under the First Amendment.

of ending the relationship . . . ." [20] Id. at 43 (citing Lyng v. Int'l Union, UAW, 485 U.S. 360, 364–66 (1988)).  "Expressive association is considered a form of 'speech,'" and "is protected by the First Amendment on that basis."  Birmingham v. Ogden, 70 F. Supp. 2d 353, 368–69 (S.D.N.Y. 1999) (collecting cases).

### 4. Plaintiffs Have Not Demonstrated An Infringement of Their Association Rights

Plaintiffs assert only that defendants' "retard" comments about Saperstein "constitute[] an attack on their freedom of association . . . ."  (Pls.' Superceding Mem. at 21.)  Plaintiffs, however, do not identify which association right they are claiming—intimate or expressive.  The Court's inability to discern which association right plaintiffs assert is fatal to their claim.

Moreover, to the extent that plaintiffs' brief can be read as claiming a right to intimate association, plaintiffs have not established any facts from which a reasonable juror could find that right was infringed.  Plaintiffs have introduced no facts suggesting that defendants' remarks had a likely effect of ending the plaintiffs' friendship.  To the extent plaintiffs argue a deprivation of the right to expressive association, that claim is duplicative of their free speech claim and suffers the same fate as described above.  See supra II.E.2.

Accordingly, the Court grants defendants' motion for summary judgment on plaintiffs' association claim.

## F.  Unreasonable Search Claims

Plaintiffs' complaint alleges that the police unreasonably searched the plaintiffs and Saperstein's car without a warrant.  (Compl. ¶¶ 21–22.).  In response to these conclusory allegations, defendants move for summary judgment, arguing that even though these searches were

---

[20] Other courts have found that the right is not violated "unless affecting the relationship was the purpose of the challenged regulation."  Id. (citing Califano v. Jobst, 434 U.S. 47, 54 (1977)).  This approach, however, has not been adopted by the Second Circuit in Patel v. Searles.  305 F.3d 130, 137 (2d Cir. 2002).

conducted without a warrant, they were still reasonable pursuant to the automobile exception to the warrant requirement. (Defs.' Supp. at 12–14, ECF No. 54 (citing United States v. Ross, 456 U.S. 798, 824 (1982); Chambers v. Maroney, 399 U.S. 42, 47 (1970); Carroll v. United States, 267 U.S. 132, 149 (1925)).)

Plaintiffs never explicitly defend the search claims in their briefs. Accordingly, the Court concludes that plaintiffs have abandoned these claims. See Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003); see also Douglas v. Victor Capital Grp., 21 F. Supp. 2d 379, 393 (S.D.N.Y.1998) (collecting cases).

The Court notes that plaintiffs' papers could be construed to assert the following argument—there was no probable cause to search the plaintiffs and Saperstein's car because there was no probable cause to arrest the plaintiffs. (Pls.' Superceding Mem. at 11–16.) To the extent plaintiffs raise this argument, summary judgment is still appropriate because this argument fails on its own terms. Because the Court finds there was probable cause to arrest, see supra II.C.3, plaintiffs' argument that the search was unreasonable because there was no probable cause to arrest must fail.

Accordingly, the Court grants defendants' motion for summary judgment on plaintiffs' search claims.

## G. District Attorney Rice's Liability

"'[A] state prosecuting attorney who acted within the scope of his [or her] duties in initiating and pursuing a criminal prosecution,' 'is immune from a civil suit for damages under § 1983.'" Shmueli v. City of New York, 424 F.3d 231, 236 (2d Cir. 2005) (quoting Imbler v. Pachtman, 424 U.S. 409, 410, 431 (1976)).

Plaintiffs concede that defendant Rice is absolutely immune to all claims because she was

acting in a prosecutorial capacity during the events alleged. Accordingly, the Court grants defendants' motion for summary judgment as to Rice.

## H. __Municipal Liability__

To defeat summary judgment on a claim for municipal liability, plaintiffs must show "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth. of N.Y. and N.J., 615 F.3d 129, 140 (2d Cir. 2010) (citation omitted); see also Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 694–95 (1978). Municipal liability is "an extension of liability, not an independent cause of action . . . ." Soto, 132 F. Supp. 3d at 459 (citing Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)). Therefore, in order to establish liability under Monell, plaintiffs must first establish an underlying constitutional violation.

Because plaintiffs have failed to establish any underlying constitutional violation, there can be no municipal liability.

Plaintiffs' Monell theory also fails on other grounds. Plaintiffs' theory can be summarized as follows—Nassau County's failure to supervise and discipline police officers for misconduct amounts to a policy or custom in which police misconduct is tolerated. In support, plaintiffs primarily rely on a Newsday article, which chronicles many episodes of police misconduct spanning police shootings, driving under the influence, engaging in sexual activity while on duty, political corruption, consuming alcohol while on duty, illicit steroid use, excessive force, falsification of sworn statements in support of arrests, and police cover ups. The Court will not consider the Newsday article and investigation, which is cited only in plaintiffs' brief. Plaintiffs' 56.1 Statement does not cite this article or any underlying evidence concerning the incidents discussed in the article. Moreover, plaintiffs do not provide the article or any underlying

documentation regarding the incidents to the Court.

The Court also notes that plaintiffs fail to show how a policy of failing to supervise and discipline officers for the events described in the article is related to the case at bar. Without a showing that a particular municipal policy or custom caused a deprivation of plaintiffs' rights, there can be no municipal liability. Hill v. City of New York, 03-CV-1283, 2005 WL 3591719, at *8 (Dec. 30, 2005) (citing Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)).

Accordingly, the Court grants defendants' motion for summary judgment as to Nassau County.

## I.   Plaintiffs' Motions to Amend

In addition to the motions discussed above, plaintiffs have also moved to amend the caption to correct the spelling of certain defendants' names and to add the names of eight police officer defendants who were previously identified as John Does and Richard Roes. The Court denies these motions as futile. As explained earlier, the Court denies plaintiffs' request to reopen discovery. Based on the current record, the police had probable cause to arrest plaintiffs, and plaintiffs have not rebutted the presumption of probable cause for their malicious prosecution claim. Plaintiffs, therefore, do not have viable causes of action against any police officers who may have been involved in the arrest and prosecution. Accordingly, amending the complaint to add the names of more police officers would be futile.

### III. CONCLUSION

For the above reasons, the Court denies plaintiffs' discovery motions, grants defendants' motion for summary judgment, denies plaintiffs' cross-motion for summary judgment, and denies plaintiffs' remaining motions.

**SO ORDERED**.

Date:   February 17, 2017
        Central Islip, New York

_____/s/ (JMA)_____
Joan M. Azrack
United States District Judge